STATE OF NORTH CAROLINA, EX REL. COMMISSIONER OF INSURANCE v. NORTH CAROLINA AUTOMOBILE RATE ADMINISTRATIVE OFFICE, NATIONWIDE MUTUAL INSURANCE COMPANY, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, THE AETNA CASUALTY AND SURETY COMPANY, HARTFORD ACCIDENT AND INDEMNITY COMPANY, GREAT AMERICAN INSURANCE COMPANY, THE TRAVELERS INSURANCE COMPANY, UNITED STATES FIDELITY AND GUARANTY COMPANY, LUMBERMENS MUTUAL CASUALTY COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, UNITED STATES FIRE INSURANCE COMPANY, IOWA NATIONAL MUTUAL INSURANCE COMPANY, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, UNIGARD MUTUAL INSURANCE COMPANY, THE SHELBY MUTUAL INSURANCE COMPANY, AMERICAN MOTORISTS INSURANCE COMPANY, AND AMERICAN MUTUAL LIABILITY INSURANCE COMPANY

No. 74

(Filed 6 May 1975)

1. Insurance § 1— power of Insurance Commissioner to fix rates

The only power the Commissioner of Insurance has to fix rates is such power as the General Assembly has delegated to and vested in him. Art. III, § 7(2) of the N. C. Constitution.

2. Statutes § 5— construction of statutes in pari materia

Statutes *in pari materia*, and all parts thereof, should be construed together and should be reconciled with each other when possible, and any irreconcilable ambiguity should be resolved so as to effectuate the true legislative intent.

3. Insurance § 79.1— automobile liability rates — primary authority — Rate Office

G.S. Chapter 58 clearly reveals the intent of the General Assembly to vest the Automobile Rate Office with primary authority to fix, adjust and propose automobile liability rates subject to the approval or disapproval of the Commissioner of Insurance, and the Commissioner has no concurrent authority with the Rate Office to fix or reduce rates. G.S. 58-246; G.S. 58-248.

4. Insurance § 79.1—automobile liability rates — emergencies — energy crisis — authority of Insurance Commissioner

The Commissioner of Insurance does not have blanket authority under G.S. 58-248.1 to consider immediate emergency situations such as the energy crisis and enter interim automobile liability rate orders based thereon, but the grant of authority to the Commissioner by the statute to order an alteration or revision in the rates charged or filed presupposes the failure of the Automobile Rate Office to perform its rate-making duties faithfully.

5. **Insurance § 79.1— automobile liability rates — sources of evidence**

    In determining whether to order a rate alteration or revision under G.S. 58-248.1, the Commissioner of Insurance may consider evidence received not only through the Automobile Rate Office but from other sources as well.

6. **Insurance § 79.1— automobile liability rates — expenses and fair profit.**

    When existing or proposed automobile liability rates provide for anticipated loss and loss adjustment expenses, anticipated expenses attributable to selling and servicing the insurance, and a fair and reasonable profit, and no more, the Commissioner of Insurance has no authority to order alteration or revision of rates under G.S. 58-248.1.

7. **Insurance § 79.1— automobile liability rates — reduction based on energy crisis — order exceeding statutory authority**

    The Commissioner of Insurance was without statutory authority to order an interim automobile liability rate reduction because of the energy crisis based on independent evidence received at a hearing where the record does not show that the Automobile Rate Office was not proceeding with due diligence in dealing with relevant factors spawned by the energy crisis. G.S. 58-9.6 (b) (2).

8. **Insurance § 79.1— automobile liability rates — interim order — acceptance of proposal as true**

    The Commissioner of Insurance has the statutory duty to consider automobile liability rate proposals in accordance with the standards contained in G.S. 58-248 and either approve or disapprove such proposals, but he has no authority merely to accept a proposal as being true and accurate for purposes of entering an interim order.

9. **Insurance § 79.1— automobile liability rates — reduction based on energy crisis — order not supported by evidence**

    Interim order of the Commissioner of Insurance reducing automobile liability insurance rates based on the energy crisis was not supported by material and substantial evidence where appellants attempted to establish a trend in insurance paid claims based on motor vehicle statistics for two months, the trending procedures were premised on the assumption that the energy crisis and its ramifications will continue into the future but there was no expert testimony to that effect, and there was no expert testimony by anyone knowledgeable in the field of insurance rate making to support the use of appellants' statistical techniques for rate-making purposes or the use of two months experience in the energy crisis as a foundation for both a rate change and a change in rate-making procedures.

APPEAL by the Commissioner of Insurance and the Attorney General, intervenor, from decision of the Court of Appeals, 24 N.C. App. 228, 210 S.E. 2d 439 (1974).

On 29 June 1973 the North Carolina Automobile Rate Administrative Office made a filing with the Commissioner of Insurance on behalf of 284 member companies, proposing a

revision in the premium rates for bodily injury and property damage liability insurance applicable to private passenger automobiles and related miscellaneous classifications. The filing was made pursuant to G.S. 58-248 and was based on the companies' experience for the two accident years ending 30 June 1971 and 30 June 1972. The original filing proposed a 9.9% average rate increase, but was amended on 26 January 1974 to reflect subsequent increases which became effective 10 October 1973. The amended filing proposed an average increase of 2.3%.

On 21 January 1974 the Attorney General intervened on behalf of the using and consuming public under G.S. 114-2(8)(a).

On 27 November 1973 and 22 January 1974 the Commissioner conducted prehearing meetings pursuant to G.S. 58-248.1 in regard to the June 1973 filing. At the January meeting the Commissioner indicated that the rate hearing would involve energy crisis considerations and "could well result in a rate reduction rather than a rate increase as requested by the Administrative Office should the evidence point that way." In response thereto the Rate Office requested formal notice of the subject matter of the rate hearing. On 25 January 1974 the Commissioner issued formal notice of a public hearing to be held on 19 February 1974 for the purpose of considering seven enumerated subjects, including the 29 June 1973 Rate Office filing and, on the Commissioner's own motion, "the need for a rate reduction in private passenger (non fleet) automobile and motorcycle liability insurance due to the 'Energy Crisis' . . . . "

On 14 February 1974 the Attorney General filed a separate motion requesting the Commissioner to begin immediate consideration of an interim rate reduction attributable to the fuel crisis. The Attorney General's motion was granted by the Commissioner at the February 19 hearing and a Rate Office motion for continuance was denied.

The Commissioner convened the rate hearing on 19 February 1974, as planned, and held subsequent sessions on February 26 and 27 and March 5 through 8.

The first witness for the Attorney General was Joseph Register, an employee of the North Carolina Department of Motor Vehicles, who gave testimony for the Attorney General relating to various motor vehicle statistics including accident and

injury statistics for December 1973 and January 1974, the focal months for the subsequent energy crisis rate reduction order. Mr. Register also testified that in his opinion the energy shortage would continue for some time and accident rates would not return to pre-November 1973 levels. The Rate Office interposed objections to the use of this data for rate-making purposes, stating that it was not relevant or applicable to rate making. Similar objections to the introduction and use of motor vehicle statistics for rate-making purposes were made throughout the hearing.

The second witness for the Attorney General was David F. Crotts, an economist with the Attorney General's Office. Mr. Crotts was tendered and accepted as an expert in the field of statistics. He stated he prepared himself for testifying in this case by studying prior filings, by talking with two attorneys on the Attorney General's staff to get their understanding of the rate-making formula, and by discussing with Mr. Register the energy crisis and its effects on motor vehicle statistics. With this background he formulated "original ideas as to how to fit the effect of the energy crisis into the rate-making formula as it has been used in North Carolina since 1961." The witness then gave lengthy testimony relating to his calculations and conclusions in regard to the rate-making formula and the energy crisis.

Mr. Crotts applied various statistical methods and performed complex computations in analyzing motor vehicle statistics obtained from Mr. Register. As a result of these procedures he reached the conclusion that there is a significant statistical correlation between reported accidents and property damage claims paid by insurance companies (i.e., paid claims will vary in accordance with reported accidents). A similar correlation was found to exist when he compared bodily injury paid claims with reported accidents, persons injured, and private passenger cars involved. The witness next calculated the average percentage change in reported accidents from one year to the next (i.e., annual change) for an eleven year period and found a 7.36% average change; the average annual change in private passenger cars involved was found to be 7.67%; and the average annual change in persons injured was found to be 6.11%. These trends were then used to predict what reported accidents, persons injured, and private passenger cars involved would have been for December 1973 and January 1974 had there

been no energy crisis. The resulting predictions were compared to actual data for the months of December and January showing that reported accidents were actually 24.48% below the prediction, persons injured were actually 26.09% below the prediction, and private passenger cars involved were 29.78% below the prediction. The estimated reductions in reported accidents, persons injured, and private passenger cars involved were attributed to the energy crisis and its effects.

The statistical findings and conclusions were then applied to the most recent information available to the witness with respect to property damage and bodily injury claims paid so as to predict a "point estimate drop" and an "interval estimate drop" in both property damage claims and bodily injury claims. He estimated a point estimate drop of 27.23% and an interval estimate drop of 21.01% to 33.45% in property damage claims, and a point estimate drop of 12.97% and an interval estimate drop of 11.80% to 14.15% in bodily injury claims. The estimated drops in property damage and bodily injury claims were finally applied to the data on the Rate Office's amended filing in order to predict a percentage rate decrease attributable to the energy crisis. The predicted decrease in rates was adjusted during the 5 March 1974 session resulting in a final predicted interval decrease in bodily injury rates of 14.51% to 16.79% (midpoint 15.65%) and a decrease in property damage rates of 11.24% to 25.18% (midpoint 18.21%). In conclusion Mr. Crotts expressed his opinion, based on the assumption that the energy crisis and its ramifications would continue into the future, that the drops in paid claims would continue at the same predicted rates.

At the close of Mr. Crotts' direct examination the Rate Office deferred his cross-examination and called Michael A. Walters, vice-president and actuary with the Insurance Services Office. Mr. Walters was qualified as an expert in mathematics, but the Commissioner refused to recognize him as an expert on automobile liability insurance rate making.

Mr. Walters testified that two years of rate-making experience traditionally have been used in North Carolina for private passenger car rates, as compared with the two months of motor vehicles data utilized by Mr. Crotts "as the entire key underlying his testimony for the projection of future insurance costs." He further stated that the high correlation between motor vehicle accidents and subsequent insurance claims was not sur-

prising since such accidents are the only source of insurance claims, but indicated he had problems accepting Mr. Crotts' conclusions because of his assumption "that if it correlates on an annual basis, it must therefore correlate on individual monthly basis." A second criticism of Mr. Crotts' testimony noted the fact that accident statistics for December 1972 and January 1973 appeared to be unusually high. "Now if those values were arbitrarily high, then to conclude that the two months average for the most recent two months as being due entirely to the energy crisis, I think it would be tenuous." Further problems were raised by Mr. Crotts' assumption that the change attributable to the energy crisis in the two most recent months would be repeated throughout the entire year 1974. Mr. Walters said the purpose of collecting insurance statistics for a two-year period was to get a reasonable estimate and prospective look at insurance experience in this State.

Mr. Crotts was recalled and testified that the figures for December 1972 and January 1973 were not randomly high "when compared to the long-run trend of previous Decembers and previous Januarys." He also stated that forecasting on the basis of past trends and correlations could be used to make monthly projections.

At the 5 March 1974 session the Commissioner announced that he was ordering a rate reduction *based on the energy crisis*. On 6 March 1974 he filed an "interim" order in which he accepted the 29 June 1973 filing of the Rate Office "as true and accurate" for purposes of the interim order. The order contained specific findings in which the Commissioner summarized and adopted the testimony and conclusions of witness Crotts relating to the effects of the energy crisis on automobile liability insurance rates. The "CONCLUSIONS AND DECISION" portion of the order reads:

> "The North Carolina Commissioner of Insurance has authority to consider immediate emergency situations such as the present energy crisis in gasoline and to enter an interim order in consideration of the same.
>
> It is proper to consider the earnings from investment of unearned premium reserves and loss reserves.
>
> Upon the evidence presented and findings made herein, the North Carolina Commissioner of Insurance hereby con-

cludes that an overall rate level decrease of 13.21% in private passenger automobile liability insurance rates to be used in North Carolina for the future, as hereinafter set out, is warranted and will produce premium rates for the future which will provide for anticipated loss and loss adjustment expenses, anticipated expenses attributable to the selling and servicing of the line of insurance involved, and provision for a fair and reasonable underwriting profit is warranted, justified, and in the public interest, and should be allowed.

This order shall remain in effect during the pendency of the energy crisis. Any party to these proceedings with evidence showing an appreciable change in any of the conditions underlying this order, may petition the Commissioner for an immediate hearing on such evidence and the hearing will be held within seven days of such petition. During the pendency of this interim order, the Commissioner will duly proceed with consideration of the 1973 filing which will result in a final order.

At the hearing held in the premises on March 5, 1974, counsel for the Rate Office stated to the Commissioner of Insurance that three weeks was the minimum time required by the insurance companies to make the necessary changes to implement this order. Because of the need for immediate action in the matter, the Commissioner stated that the order would become effective March 26, 1974.

Now, therefore, be it, and the same hereby is, ORDERED, that the private passenger automobile liability insurance rates for use in North Carolina in the future be decreased by 14.51% for bodily injury and 11.24% for property damage hereinabove set out to be effective on March 26, 1974.

This order shall remain in effect until modified by the Commissioner by subsequent interim order or final order."

A supplementary order, filed 8 March 1974, provided that the rate reduction would apply to every policy or policy renewal written, delivered or issued for delivery in this State on and after 26 March 1974 and to any such policy bearing an initial or renewal effective date of 26 March 1974 or thereafter.

The Rate Office appealed from the Commissioner's order to the Court of Appeals pursuant to the provisions of G.S. 58-9.4

---

Comr. of Insurance v. Automobile Rate Office

---

et seq. The Court of Appeals, with Brock, C.J., dissenting, reversed the order of the Commissioner because (1) it is in excess of statutory authority of the Commissioner; (2) it is unsupported by material and substantial evidence in view of the entire record; and (3) it is affected by other errors of law. The Attorney General and the Commissioner of Insurance appealed to the Supreme Court pursuant to G.S. 7A-30(2), assigning errors noted in the opinion.

*John Randolph Ingram, Commissioner of Insurance, by Hugh R. Owen, Staff Attorney, for the Commissioner of Insurance, appellant.*

*Rufus L. Edmisten, Attorney General, by Isham B. Hudson, Jr., Assistant Attorney General, for intervenor appellant.*

*Allen, Steed and Pullen, P.A., by Arch T. Allen, Thomas W. Steed, Jr., and Lucius W. Pullen; Broughton, Broughton, McConnell & Boxley, by J. Melville Broughton, Jr.; Sanford, Cannon, Adams & McCullough, by Hugh Cannon; Young, Moore & Henderson, by Charles H. Young, for the North Carolina Automobile Rate Administrative Office and individually named insurance companies, appellees.*

HUSKINS, Justice.

Appellants' assignments one and two allege the Court of Appeals erred in reversing the order of the Commissioner of Insurance on grounds that it was (1) in excess of his statutory authority and (2) not supported by material and substantial evidence. Due to the statutory framework underlying these contentions, we will consider them together.

The history and framework of North Carolina's insurance laws, codified as Chapter 58 of the General Statutes, were reviewed by Chief Justice Bobbitt in *In re Filing by Automobile Rate Office,* 278 N.C. 302, 180 S.E. 2d 155 (1971). With that background in mind, we limit our discussion to those provisions pertinent to the controversy here involved. For further background discussion, see also *Allstate Insurance Company v. Lanier,* 242 F. Supp. 73 (E.D. N.C. 1965), *aff'd* 361 F. 2d 870 (4th Cir.), *cert. denied* 385 U.S. 930, 17 L.Ed. 2d 212, 87 S.Ct. 290 (1966).

G.S. 58-9 sets out the general powers and duties of the Commissioner of Insurance and confers upon him the duty to

"[s]ee that all laws of this State governing insurance companies, associations, orders or bureaus relating to the business of insurance are faithfully executed, and to that end he shall have power and authority to make rules and regulations, not inconsistent with law, to enforce, carry out and make effective the provisions of this Chapter, and to make such further rules and regulations not contrary to any provisions of this Chapter which will prevent practices injurious to the public by insurance companies. . . ."

G.S. 58-9.4, enacted in 1971 to expedite the rate-making processes, provides for direct review by the Court of Appeals of "[a]ny order or decision of the Commissioner that the premium rates charged or filed on all or any class of risks are excessive, inadequate, unreasonable, unfairly discriminatory or are otherwise not in the public interest. . . ." This section also provides: "Any order or decision of the Commissioner, if supported by substantial evidence, shall be presumed to be correct and proper."

G.S. 58-9.5 establishes the procedures on appeal under G.S. 58-9.4 and provides that such an appeal stays the Commissioner's order or decision pending determination of the appeal.

G.S. 58-9.6 sets out the scope of review under G.S. 58-9.4 and provides that the Court of Appeals may reverse or modify a decision of the Commissioner which is (1) in violation of constitutional provisions, (2) in excess of statutory authority or jurisdiction of the Commissioner, (3) made upon unlawful proceedings, (4) affected by other errors of law, (5) unsupported by material and substantial evidence in view of the entire record as submitted, or (6) arbitrary or capricious.

G.S. 58-248.1, under which the Commissioner claims authority to enter the order contested in this case, confers authority on the Commissioner to enter orders directing revision of improper rates, classifications or classification assignments. To facilitate orderly discussion of the assignments and avoid repetition, the pertinent provisions of this statute will appear later in this opinion. For historical background of G.S. 58-248.1 and other changes in North Carolina insurance laws wrought by Chapter 381 of the 1945 Session Laws, see Wettach, The 1945 Revision of the Insurance Laws of North Carolina, 23 N.C.L. Rev. 283 (1945); Report of the Governor's Study Commission on Automobile Liability Insurance and Rates (N. C. April 15,

1971); Report of the North Carolina Commission on Revision of the Insurance Laws (January 30, 1945).

G.S. 58-248 establishes the procedures to be followed by the Rate Administrative Office in obtaining Commissioner approval of a rate change and enumerates the factors to be considered in determining the necessity for a rate adjustment. Under that section the Commissioner is authorized to compel production of any data "necessary to compile statistics for the purpose of determining the underwriting experience of automobile liability injury and property damage insurance" and to make that data available to the Rate Office "for the capitulation [sic] and promulgation of rates." The section contains the following statement in regard to approval or disapproval of rates by the Commissioner: "All such rates compiled and promulgated by such bureau shall be submitted to the Commissioner of Insurance for approval and no such rates shall be put into effect in this State until approved by the Commissioner of Insurance and not subsequently disapproved." Factors to be considered by the Commissioner and Rate Office in the rate-making process are enumerated as follows:

> "The Commissioner of Insurance in considering any rate compiled and promulgated by the bureau may take into consideration the earnings of all companies writing automobile liability insurance in this State realized from the investment of unearned premium reserves and investments from loss reserves on policies written in this State. The amount of earnings may in an equitable manner be included in the rate-making formula to arrive at a fair and equitable rate.

> In determining the necessity for an adjustment of rates the Commissioner shall give consideration to past and prospective loss experience, including the loss-trend and other relevant factors developed from the latest statistical data available; to such relevant economic data from reliable indexes which demonstrate the trend of costs relating to the line of automobile insurance for which rates are being considered and to such other reasonable and related factors as are relevant to the inquiry. The bureau in promulgating and fixing rates shall consider the same factors and shall prepare and present such information, data, indexes and exhibits with the rate filing." G.S. 58-248.

G.S. 58-248 further requires the Rate Office to submit rate proposals to the Commissioner on or before July 1 of each calendar year and requires the Commissioner to approve or disapprove the proposals within ninety days.

With this statutory background, we turn to the appellants' contention that G.S. 58-248.1 vests the Commissioner with authority to order an interim rate reduction in this case.

[1]    While the Office of Commissioner of Insurance is created by Article III, sec. 7 (1) of the North Carolina Constitution, section 7 (2) of that Article says his duties shall be prescribed *by law*. Hence, the power and authority of the Commissioner emanate from the General Assembly and are limited by legislative prescription. The only power he has to fix rates is such power as the General Assembly has delegated to and vested in him. *In re Filing by Automobile Rate Office*, 278 N.C. 302, 180 S.E. 2d 155 (1971) ; *Comr. of Insurance v. Automobile Rate Office*, 19 N.C. App. 548, 199 S.E. 2d 479, *cert. denied* 284 N.C. 424, 200 S.E. 2d 663 (1973).

[2]    We are further guided by rules of construction that statutes *in pari materia*, and all parts thereof, should be construed together and compared with each other. *Redevelopment Commission v. Bank*, 252 N.C. 595, 114 S.E. 2d 688 (1960). Such statutes should be reconciled with each other when possible, and any irreconcilable ambiguity should be resolved so as to effectuate the true legislative intent. *Duncan v. Carpenter*, 233 N.C. 422, 64 S.E. 2d 410 (1951) ; *McLean v. Board of Elections*, 222 N.C. 6, 21 S.E. 2d 842 (1942) ; *Thomasson v. Patterson*, 213 N.C. 138, 195 S.E. 389 (1938).

[3]    Chapter 58 of the General Statutes clearly reveals the intent of the General Assembly to vest the Rate Office with primary authority to fix, adjust and propose rates subject to the approval or disapproval of the Commissioner of Insurance. G.S. 58-246 and 248. "The Commissioner *shall approve* proposed changes in rates, classifications or classification assignments to the extent necessary to produce rates, classifications or classification assignments which are reasonable, adequate, not unfairly discriminatory, and in the public interest." G.S. 58-248 (Emphasis added). Chapter 58 grants the Commissioner broad regulatory and supervisory powers for overseeing the faithful execution of the insurance laws of this State. But we find no provision in that chapter giving the Commissioner concurrent authority with the Rate Office to *fix* or *reduce* rates.

**[4, 5]** The Commissioner relies on the provisions of G.S. 58-248.1 which read in pertinent part as follows:

> "Whenever the Commissioner, upon his own motion or upon petition of any aggrieved party, shall determine after notice and a hearing, that the rates charged or filed on any class of risks are excessive, inadequate, unreasonable, unfairly discriminatory, or otherwise not in the public interest, or that a classification or classification assignment is unwarranted, unreasonable, improper or unfairly discriminatory he shall issue an order to the bureau directing that such rates, classifications or classification assignments be altered or revised in the manner and to the extent stated in such order to produce rates, classifications or classification assignments which are reasonable, adequate, not unfairly discriminatory, and in the public interest."

We are of the opinion, and so hold, that when the quoted language is read aright it will not support the Commissioner's conclusion that he has blanket authority thereunder to consider immediate emergency situations such as the energy crisis and enter *interim* rate orders based thereon. To so construe the statute ignores the function of the Rate Office and infringes upon its authority to fix, adjust and propose rates. When G.S. 58-248.1 is construed *in pari materia* with the other provisions of Chapter 58, we think the legislative grant of authority to the Commissioner to order an alteration or revision in the rates charged or filed presupposes the failure of the Rate Office to perform its rate-making duties faithfully. Before the Commissioner can order, "to the extent stated in such order," a rate alteration or revision under G.S. 58-248.1, he must first make a determination that the rates charged or filed are excessive, inadequate, unreasonable, unfairly discriminatory or otherwise not in the public interest. In reaching that determination he "shall give consideration to past and prospective loss experience, including the loss-trend and other relevant factors developed from the latest statistical data available; to such relevant economic data from reliable indexes which demonstrate the trend of costs relating to the line of automobile insurance for which rates are being considered and to such other reasonable and related factors as are relevant to the inquiry." G.S. 58-248. The quoted language is broad enough to include evidence, if otherwise competent, received not only through the Rate Office but from other sources as well.

[6]   In the application of these standards, "[p]roposed rates shall not be deemed unreasonable, inadequate, unfairly discriminatory or not in the public interest, if such proposed rates make adequate provision for premium rates for the future which will provide for anticipated loss and loss adjustment expenses, anticipated expenses attributable to the selling and servicing of the line of insurance involved and a provision for a fair and reasonable underwriting profit." G.S. 58-248; *In re Filing by Automobile Rate Office,* 278 N.C. 302, 180 S.E. 2d 155 (1971). When existing or proposed rates provide for these expenses and for a *fair and reasonable profit,* and no more, the Commissioner has no authority to order alteration or revision of rates under G.S. 58-248.1.

Appellants do not allege collusion, conspiracy or other deviations from established rate-making practices by the Rate Office. On the contrary, it appears the Rate Office has followed established rate-making procedures based on underwriting experience statistics as prescribed by G.S. 58-248. Appellants are the parties contending that established rate-making principles will result in excessive rates in light of the energy crisis. Therefore, the gist of this controversy involves the selection of rate-making techniques which will properly account for the effects of the energy crisis on automobile liability insurance rates. The authority and duty to account to the public for such an emergency situation lies primarily in the Rate Office until the Commissioner finds that a proposed accounting by the Rate Office will result in unreasonable or unfair profits or that the Rate Office has engaged in undue delay in reacting to the situation. Ordinarily, the law contemplates the revision of rates on an annual basis.

[7]   Here the Rate Office's 29 June 1973 filing does not purport to deal with the energy crisis since it was based on a two-year experience period ending 30 June 1972. Indeed, the full effects of the energy crisis were not being publicly felt in November 1973 when the first prehearing meeting was held on that filing, and only two months data relating to the energy crisis was available at the final hearing. Consequently, this record, including the showing by appellants of one method for computing rates based on motor vehicle statistics and the "original ideas" of an expert statistician, who the appellants admit is not an expert in insurance rate making, will not support a conclusion that the Rate Office was not proceeding with due diligence in

---
Comr. of Insurance v. Automobile Rate Office
---

dealing with relevant factors spawned by the energy crisis. We hold, therefore, that the Commissioner was without statutory authority to enter the rate reduction order and supplementary order based on independent evidence received at the hearing. G.S. 58-9.6 (b) (2).

[8] Furthermore, we note that the Commissioner has the statutory duty to consider rate proposals in accordance with the standards contained in G.S. 58-248 and either approve or disapprove such proposals. He has no authority to merely *accept* a proposal as being *true and accurate for purposes of entering an interim order*. Such action by the Commissioner in his 6 March 1974 order also exceeded his statutory authority.

[9] Even if we assume *arguendo* that the Commissioner had authority under G.S. 58-248.1 to order an interim rate reduction based on the energy crisis, his order of 6 March 1974 must still fall because it is not supported by material and substantial evidence in view of the entire record as submitted.

Substantial evidence has been described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 95 L.Ed. 456, 71 S.Ct. 456 (1951) ; *see* Hanft, Some Aspects of Evidence in Adjudications by Administrative Agencies in North Carolina, 49 N.C.L. Rev. 635, 666-68 (1971) ; 2 Am. Jur. 2d, Administrative Law §§ 621 and 688 (1962). "Substantial evidence is more than a scintilla or a permissible inference." *Utilities Commission v. Trucking Company,* 223 N.C. 687, 690, 28 S.E. 2d 201, 203 (1943).

The insurance rate-making process is an attempt to predict the future by relying in large measure upon what has occurred in the past. Report of the Governor's Study Commission on Automobile Liability Insurance and Rates at 41 (N.C. April 15, 1971). Among factors to be considered in making this prediction are "the loss-trend and other relevant factors developed from the latest statistical data available" and "other reasonable and related factors as are relevant to the inquiry." G.S. 58-248. We have previously held, in the related area of fire insurance, that "reasonable and related factors" may be shown by "evidence, otherwise competent, of a cost trend, upward or downward, which continues from the past into the present, *and expert testimony, otherwise competent, that such trend may reasonably be expected to continue into the future,* so that future

costs will be higher or lower than present costs." (Emphasis added.) *In re Filing by Fire Ins. Rating Bureau,* 275 N.C. 15, 36, 165 S.E. 2d 207, 222 (1969).

The appellants in this case have avoided the use of traditional loss experience data as prescribed in G.S. 58-248, and have attempted to establish a trend in insurance paid claims based on motor vehicle statistics alone. When this evidence is scrutinized it appears that the trending procedures formulated by witness Crotts are admittedly premised upon the assumption that the energy crisis and its ramifications will continue into the future. But there is no expert testimony supporting the assumption that the energy crisis as it existed during December 1973 and January 1974 could reasonably be expected "to continue into the future" with the same disastrous effects so obvious during the two months in question. While Mr. Register did testify that he expected the energy shortage to continue for some time, his expertise in motor vehicle statistics does not warrant such an opinion and the Commissioner was not entitled to rely on it in entering his order. Likewise, there was no expert testimony by anyone knowledgeable in the field of insurance rate making to support either the use of witness Crotts' "original ideas" for rate-making purposes or the use of two months experience in the energy crisis as a foundation for both *a rate change and a change in rate-making procedures.* To the contrary, Mr. Walters, the only witness knowledgeable of insurance rate making, expressed serious doubts concerning the techniques used by appellants to conclude a rate reduction was warranted. The Commissioner's order in this case is not supported by substantial evidence in view of the entire record as submitted and therefore cannot stand. G.S. 58-9.6 (b) (5).

For the reasons stated the decision of the Court of Appeals, reversing the order of the Commissioner of Insurance, is affirmed. The Commissioner's interim order filed 6 March 1974 and his supplementary order filed 8 March 1974 are vacated. The case is remanded to the Court of Appeals for further remand to the Commissioner of Insurance for disposition of the filing according to law.

Affirmed and remanded.