231 S.E.2d 882 (1977)
292 N.C. 70
STATE of North Carolina ex rel. COMMISSIONER OF INSURANCE
v.
NORTH CAROLINA FIRE INSURANCE RATING BUREAU.
No. 91.
Supreme Court of North Carolina.
February 8, 1977.
*885 Rufus L. Edmisten, Atty. Gen. by Isham B. Hudson, Jr., Asst. Atty. Gen. and Hunter & Wharton by John V. Hunter, III, Raleigh, for plaintiff.
Joyner & Howison by Walton K. Joyner, and Edward S. Finley, Jr., Raleigh, for defendant.
HUSKINS, Justice.
We first turn to the contention of the Rating Bureau that the proposed rates were "deemed" approved under G.S. 58-131.1 upon failure of the Commissioner, in writing, to disapprove the rates within 60 days after submission.
G.S. 58-131.1, codified from Chapter 380 of the 1945 Session Laws, reads as follows:
"No rating method, schedule, classification, underwriting rule, bylaw, or regulation shall become effective or be applied by the Rating Bureau until it shall have been first submitted to and approved by the Commissioner. Provided, that a rate or premium used or charged in accordance with a schedule, classification, or rating method or underwriting rule or bylaw or regulation previously approved by the Commissioner need not be specifically approved by the Commissioner. Every rating method, schedule, classification, underwriting rule, bylaw or regulation submitted to the Commissioner for approval shall be deemed approved, if not disapproved by him in writing within 60 days after submission."
In clear language this statute provides that a proposed rate is deemed approved if the Commissioner does not act within 60 days after the submission of the proposal to disapprove it in writing. Operation of the "deemer" provision can be averted only by the approval or disapproval of the Commissioner within 60 days.
The Commissioner contends, however, that G.S. 58-27.1(c) and G.S. 58-27.2(a) require public hearings on proposed rate adjustments before the Commissioner may act upon the proposal and therefore a proposed change in rates cannot be "deemed approved" upon the lapse of 60 days when *886 there has been no public hearing. The cited statutes provide in pertinent part as follows:
"The insurance advisory board shall. . . promulgate rules and regulations to provide for the holding of public hearings before the Commissioner of Insurance. . . on such proposals, to revise an existing rating schedule the effect of which is to increase or decrease the charge for insurance or to set up a new rating schedule, as are subject to the approval of the Commissioner and as, in the judgment of the board, are of such nature and importance as to justify and require a public hearing." G.S. 58-27.1(c)
"Whenever any statutory or licensed insurance rating bureau or any insurance company making its own rate filings makes any proposal to revise an existing rating schedule, the effect of which is to increase or decrease the charge for insurance, or to set up a new rating schedule, and such rating schedules are subject to the approval of the Commissioner, such bureau or company shall file its proposed change and supporting data with the Commissioner who shall thereafter, before acting upon any such proposal, order a public hearing thereon, if such hearing is required by the rules and regulations adopted by the insurance advisory board. . .." G.S. 58-27.2(a).
Pursuant to the quoted statutes the insurance advisory board adopted the following regulation:
"1. Any rate adjustment or proposal involving a general revision of an existing rating schedule which the Commissioner or the Advisory Board finds upon investigation involves a material change in the rate level, or the setting up of a new rating schedule of a material nature for a kind of insurance or for a separately rated major subdivision thereof, shall be subject to a public hearing prior to action thereon by the Insurance Commissioner."
See Comr. of Insurance v. Rating Bureau, 291 N.C. 55, 229 S.E.2d 268 (1976).
The Commissioner argues that inaction which activates the deemer provision of GS 58-131.1 is, in reality, "action" on his part because it results in approval of the proposed rates. Therefore, he reasons, a public hearing is required before the deemer provision can be triggered. This ingenious argument sets the mandates of the deemer provision in direct conflict with the public hearing provisions and, the Commissioner notes, since the statutory requirement for a public hearing is the more recent enactment of the Legislature, to the extent of any conflict between the deemer and the hearing provisions, the latter must prevail. This principle of statutory construction is sound, Comr. of Insurance v. Rating Bureau, supra, but it is also true that statutes dealing with the same subject matter must be construed in pari materia and harmonized, if possible, to give effect to each. Comr. of Insurance v. Automobile Rate Office, 287 N.C. 192, 214 S.E.2d 98 (1975); Person v. Garrett, Comr. of Motor Vehicles, 280 N.C. 163, 184 S.E.2d 873 (1971); Redevelopment Commission v. Bank, 252 N.C. 595, 114 S.E.2d 688 (1960). See 7 Strong's N.C. Index 2d, Statutes § 5 and cases there cited. Any irreconcilable ambiguity should be resolved so as to effectuate the true legislative intent. Comr. of Insurance v. Automobile Rate Office, supra; Duncan v. Carpenter, 233 N.C. 422, 64 S.E.2d 410 (1951). With these rules of statutory construction in mind, we turn to the allegedly conflicting statutes to determine whether the deemer provision is viable in the absence of a public hearing.
Close examination of the public hearing requirement, G.S. 58-27.2(a), and the deemer provision, G.S. 58-131.1, reveals that the two statutes create no irreconcilable conflict. For the reasons which follow, we hold that, correctly construed, the two statutes are not in conflict and may be harmonized to give effect to each.
In establishing the rate-making procedures, the Legislature provided three methods by which the Commissioner may dispose of proposed rate changes, to wit: (1) He may approve the proposed rate adjustment; (2) he may disapprove it; or (3) he may do neither for 60 days and the proposal is *887 thereupon deemed approved. G.S. 58-131.1. To avoid the automatic operation of the deemer provision, the Commissioner must approve or disapprove the proposal in writing within 60 days after submission. Approval or disapproval necessarily contemplates action by the Commissioner, and a public hearing is required prior to such action upon a proposed material rate change. G.S. 58-27.2(a).
Rate adjustment proposals may be temporarily resolved by the third alternative left to the Commissioner by the General Assembly. When no action is taken upon a proposed rate adjustment within 60 days after submission, the law provides that the proposal "shall be deemed approved." This deemer provision does not require a hearing. A hearing is prerequisite to valid action by the Commissioner, whereas no action by the Commissioner automatically triggers the deemer provision.
Moreover, when the deemer provision is construed in pari materia with the statutes calling for a public hearing, it functions in conjunction with such requirements to provide procedural due process in rate adjustment proceedings.
A primary consideration of the Legislature in adopting the rate-making scheme contained in Chapter 58 of the General Statutes was to ensure that rates fair to both the insured and the insurer be established. G.S. 58-131.2. For this reason it adopted requirements that material rate adjustments may be implemented only after a full hearing on the merits. Such a requirement, standing alone, cannot ensure fair rates because factors influencing rates may, and do, frequently change. It is therefore important that the rate-making process be not only fair but also prompt. The records of recent cases before this Court reveal instances where not only proposed rate increases but also proposed rate reductions have been arbitrarily delayed so long that the proposals became obsolete before any action thereon was taken by the Commissioner. See, for example, Comr. of Insurance v. Rating Bureau, supra.
Thus the deemer provision is addressed to the problem of promptness. By requiring action within 60 days, it prevents arbitrary and unreasonable delays which wreck the delicate balance of the rate-making process. By encouraging prompt hearings and active investigation by the Commissioner, the "deemer" acts as a necessary catalyst to the system and thus, rather than being in conflict with the hearing requirement, is a necessary adjunct to it.
Applying these legal principles to the facts before us, we hold that under the deemer provision of G.S. 58-131.1, the proposed rates were deemed approved on 19 September 1975, 60 days after the initial filing. The Commissioner's disapproval on 18 September 1975 was invalid because no public hearing had been held.
Similarly, we find no merit in the contention of the Commissioner that his action in setting a hearing date tolled the running of the 60-day period. Nothing in the statute suggests such interpretation. The plain language of the deemer provision compels a contrary conclusion.
If conducting the required public hearing within 60 days of the filing taxes the Commissioner's time, G.S. 58-27.1(c), and the rules adopted by the Insurance Advisory Board pursuant thereto, permit the hearing to be held before the Commissioner or "any person employed by the Insurance Department authorized by the Commissioner to act in his stead."
We must now determine the status of the proposed rates which were deemed approved on 19 September 1975. Since the "deemer" provision operates in conjunction with the hearing provisions, it cannot stand alone as a final resolution of the proposal. Final resolution comes only after a valid approval or disapproval by the Commissioner. We hold, therefore, that where, as here, the deemer provision is triggered by failure of the Commissioner to validly approve or disapprove a proposed rate adjustment, it operates only as a temporary approval pending valid action by the Commissioner as contemplated by G.S. 58-27.1(c) and G.S. *888 58-27.2(a). Thus, in the present case, the Bureau is lawfully entitled to place the proposed rates into effect, prospectively, under the deemer provision until such time as a valid final order is entered by the Commissionereither in this proceeding or in a subsequent filing.
We now turn to the question whether the hearings finally conducted in October 1975 and the subsequent order of the Commissioner dated 6 November 1975 constitute a valid disapproval of the Bureau's proposal, superseding the rates deemed approved on 19 September 1975.
The Rating Bureau was organized "for the purpose of making rates and rules and regulations which affect or determine the price which policyholders shall pay for insurance. . . on property or risks located in this State." G.S. 58-127. Since changes in external circumstances and conditions force periodic revision of established rates, the Legislature has prescribed procedures to facilitate necessary changes. There are two methods by which changes in premium rates may be put into effect. It is the first of these with which we are presently concerned, i. e., "the Bureau may file with the Commissioner of Insurance, for approval by him, a proposal for such change, either an increase or a decrease. G.S. 58-131.1." Comr. of Insurance v. Rating Bureau, supra.
A mere filing is not sufficient but is subject to approval by the Commissioner. There is no presumption that a rate filing by the Bureau is proper. Rather, "the burden is upon the Bureau to show that the rate schedule proposed by it is `fair and reasonable' and that it does not discriminate unfairly between risks." In re Filing by Fire Ins. Rating Bureau, 275 N.C. 15, 165 S.E.2d 207 (1969). It follows that where the Bureau has not produced substantial evidence to support its filing, the Commissioner is authorized, and it is his duty, to enter an order disapproving the filing. See G.S. 58-9; G.S. 58-127; G.S. 58-131.1. Any such order or decision is subject to review by the courts as provided in G.S. 58-9.4, et seq. Where, as here, the Commissioner enters an order that the proposed rates are unreasonable, unfairly discriminatory or not in the public interest, G.S. 58-9.4 requires that such order be based on findings of fact and conclusions of law.
In setting out the extent of judicial review, the Legislature provided in G.S. 58-9.6(b) that:
"The court may affirm or reverse the decision of the Commissioner, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commissioner's findings, inferences, conclusions or decisions are:
* * * * * *
(5) Unsupported by material and substantial evidence in view of the entire record as submitted . . .."
Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Comr. of Insurance v. Automobile Rate Office, supra.
Thus when the Rating Bureau makes a filing the Commissioner may disapprove that filing on the ground that it is not supported by material and substantial evidence. In doing so, it is incumbent upon the Commissioner to make findings of fact which specifically point out the absence of, or deficiencies in, the evidence produced in support of the filing. These findings must be supported by material and substantial evidence in view of the entire record as submitted. G.S. 58-9.6(b)(5).
In his order of 6 November 1975 the Commissioner disapproved the filing of the Rating Office. The order is apparently based on Conclusion of Law No. 5 that "[t]he filing is improper and the rates proposed therein are unwarranted, unreasonable, improper, unfairly discriminatory, and not in the public interest." Such conclusion of law, if based on adequate findings of fact which are supported by competent evidence, will support the order of the Commissioner. We now examine the findings of fact upon which this conclusion of law is based.
*889 The Commissioner makes the following findings of fact in support of his Conclusion of Law No. 5:
* * * * * *
"5. The filing contained no trend adjustment for changes in claim frequencies.
6. Portions of the filing were not supported by North Carolina data, but instead relied solely on countrywide data.
7. Other portions of the filing were not supported by data from all the companies actually in operation in automobile physical damage insurance in North Carolina, but instead relied solely on data from certain selected companies.
8. Loss and premium data for automobile physical damage insurance in North Carolina for the year ending December 31, 1974 was required to be filed with Insurance Services Office by February 15, 1975, but was not included in this filing made on July 21, 1975.
9. The Fire Bureau failed to produce substantial evidence upon which the Commissioner could make specific findings of fact as to (1) the reasonably anticipated loss experience during the life of the policies to be issued in the near future, (2) the reasonably anticipated operating expenses in the same period, and (3) the percentage of earned premiums which will constitute a fair and reasonable profit in that period.
10. The Fire Bureau failed to produce sufficient evidence to support a conclusion that 5% is a fair and reasonable profit for automobile physical damage insurance in North Carolina at this time.
11. The Fire Bureau failed to show that the rates that it proposed in this filing are fair and reasonable or that said rates will produce a profit which is fair and reasonable."
We now turn to the question whether these findings support the conclusion and, if so, whether the findings themselves are supported by material and substantial evidence in view of the entire record as submitted. G.S. 58-9.6(b).
It is conceded that the filing contained no trend adjustment for claim frequencies. Does the absence of this data constitute a defect in the Bureau filing? The only testimony concerning the relevancy of the trend adjustment is that of witness Biondi who stated: "We believe, based upon information that we have looked at in the past, that claim frequency for physical damage coverage tends to remain relatively constant from year to year. . . . Claim frequency is something that Insurance Services Office monitors for all lines. In past years, Insurance Services Office has never noticed an appreciable trend in claim frequency in automobile physical damage. Therefore, we have never used the trend factor for claim frequency." Thus, there is no evidence to support a conclusion that omission of data on trend adjustment for claim frequency constituted a defect in the filing. It follows that Finding of Fact No. 5 is irrelevant and affords no support for the Commissioner's Conclusion of Law No. 5.
As to Finding of Fact No. 6, it is again admitted by the Bureau that certain portions of the filing relied upon countrywide data rather than North Carolina data exclusively. The Commissioner's finding does not specify the "portions" of the filing with which he is concerned. Nevertheless, we have examined the portions where countrywide data was used, particularly with reference to (1) the use of the factor 1.145 to increase particular losses to reflect incurred losses and loss adjustment expense, (2) loss repair costs trend information supplied by the U.S. Bureau of Labor Statistics, and (3) expense data obtained from Insurance Services Office member companies. In every instance there is testimony that the countrywide data is representative of intrastate experience and thus has validity with respect to North Carolina rate-making. In no instance is there any testimony to the contrary. Therefore it is apparent that this finding provides no support for the Commissioner's Conclusion of Law No. 5.
By his Finding of Fact No. 7 the Commissioner finds that portions of the filing *890 relied solely on data taken from certain selected North Carolina companies rather than from all companies operating in North Carolina. Evidence of record indicates the controverted segment of the filing was supported by countrywide data which was properly considered in light of the testimony of the witness Biondi that "the tendency is for expense provisions in particular states. . . to be very close to the countrywide expense provisions. In my opinion, there would be no significant gain in accuracy to have a special call for North Carolina expense experience in physical damage. I have never seen a special call for North Carolina." There is no evidence to the contrary. Moreover, data from selected North Carolina companies was apparently offered merely to support the countrywide data and to show the Commissioner, when he came to weigh and evaluate the evidence, that countrywide expense data was not out of line with North Carolina experience. Thus the record reveals that Finding of Fact No. 7 is not supported by material and substantial evidence and therefore can provide no support for the Commissioner's Conclusion of Law No. 5.
As to Finding of Fact No. 8, the uncontradicted evidence is that the loss and premium data for automobile physical damage insurance in North Carolina for the year ending 31 December 1974, although filed with Insurance Services Office on 15 February 1975, was not included in this filing because tabulation of the data had not been completed when this filing was made on 21 July 1975. "In making this tabulation, individual companies report to Insurance Services Office unit records of premiums for each policy that is written. This unit record will tell Insurance Services Office that amount of premium on that policy. We get these unit records to produce the statistics. We not only combine the records, but we also divide the data into the various classes that are generally used for rate-making. We add the data on a unit-by-unit basis to insure to the greatest extent possible that the data is completely accurate. This procedure takes time, and for that reason, we do not have the entire year of 1974 available yet." There is no evidence of bad faith or unnecessary delay in the tabulation of this data. It necessarily follows that finding No. 8, although correct on its face as a naked statement, is irrelevant and cannot undergird the Commissioner's Conclusion of Law No. 5.
With respect to Finding of Fact No. 9, it is unquestionably true that the Bureau is required to produce substantial evidence as to (1) the reasonably anticipated loss experience during the life of the policies to be issued in the near future, (2) the reasonably anticipated operating expenses in the same period, and (3) the percentage of earned premiums which will constitute a fair and reasonable profit in that period. In re Filing by Fire Insurance Rating Bureau, supra. Whether this finding is accurate in light of the entire record is another matter.
The Commissioner does not specify how or why the evidence offered is regarded as insubstantial. It appears that this finding is based primarily on the assumption that those items of evidence offered in support of findings 5 through 8, and rejected, should be disregarded. Thus finding No. 9 is in reality a summation of previous findings 5 through 8, and there is no material and substantial evidence in the record to support it. To the contrary, our examination of the entire record as submitted discloses substantial evidence upon which the Commissioner could have made a finding to the contrary.
With respect to finding No. 10, the Commissioner finds that the Fire Bureau failed to produce sufficient evidence that 5 percent is a fair and reasonable profit for automobile physical damage insurance. The evidence in the record on this subject indicates that, at present and in the past, 5 percent is and has been generally accepted as a fair and reasonable profit. This testimony is uncontradicted. Under these circumstances the evidence is ordinarily regarded as competent and sufficient to establish the profit figure. See In re Filing by Automobile Rate Office, 278 N.C. 302, 180 S.E.2d 155 (1971). The Commissioner's *891 finding to the contrary is unsupported by material and substantial evidence in view of the entire record as submitted. G.S. 58-9.6(b). Finding of Fact No. 11 is a further repetitious summation of matters already discussed.
Since the Commissioner's Conclusion of Law No. 5 contained in his order of 6 November 1975 is supported only by conclusory findings of fact which, in turn, are unsupported by material and substantial evidence in view of the entire record as submitted, we hold that the order of the Commissioner does not constitute a valid disapproval of the Bureau's filing so as to supersede the rates deemed approved on 19 September 1975.
For the reasons stated, that portion of the decision of the Court of Appeals holding the deemer provision inoperative for lack of a public hearing is reversed, and that portion holding invalid the Commissioner's order of 6 November 1975 is affirmed.
As to defendant's appealReversed.
As to plaintiff's appealAffirmed.