JEFFERSON L. EVERS, PLAINTIFF v. PENDER COUNTY BOARD OF EDUCA-
TION AND HAYWOOD DAVIS, SUPERINTENDENT, DEFENDANT

No. 905SC921

(Filed 3 September 1991)

1. **Schools § 13.2 (NCI3d)— suspension—action not begun within
   90 days—action not barred**
   While N.C.G.S. § 115C-325(f1) clearly requires the reinstate-
   ment of a teacher who has been suspended with pay once
   ninety days have passed without the initiation of dismissal
   proceedings, it does not prohibit the subsequent initiation of
   dismissal proceedings against the teacher.

   **Am Jur 2d, Schools § 208.**

2. **Schools § 13.2 (NCI3d)— teacher dismissal—witnesses not on
   furnished list—failure to object**
   Plaintiff waived any objection when he failed to object
   in response to a specific call by the Board Chairman for objec-
   tions to the testimony of two witnesses called by the Board
   who were not on the list of witnesses given plaintiff prior
   to the hearing.

   **Am Jur 2d, Schools §§ 192, 194.**

1

3. **Schools § 13.2 (NCI3d)— teacher dismissal—Board of Education's attorney—acting as judge—no error**

Plaintiff teacher was not denied due process of law at his dismissal hearing where the Board of Education's attorney was allowed to act as an "impartial law judge" and make certain procedural and evidentiary rulings. It is clear from the record that the Board did not use any of the notes prepared by its attorney during the investigation and there was thus no danger that the Board was biased by the prior investigatory notes. There was also no showing that plaintiff was in any way prejudiced by the Board's use of its attorney's hearing notes during deliberations; indeed, plaintiff manifested his acquiescence in the Board's use of the notes.

**Am Jur 2d, Schools §§ 192, 193.**

4. **Schools § 13.2 (NCI3d)— teacher dismissal—rumors—no error**

There were sufficient indicia that the Board acted impartially and was not influenced by rumors at plaintiff teacher's dismissal hearing in the instruction given the Board by its attorney and the Board Chairman's assurance that the Board would consider nothing more than the evidence presented during the hearing. Prior knowledge and discussion of the facts relating to a given adjudicatory hearing are inevitable aspects of the multi-faceted roles which Board members play. Plaintiff here not only fails to indicate the exact nature of the rumors which the Board is alleged to have considered, but also fails to point out how the Board may have been biased by the rumors.

**Am Jur 2d, Schools §§ 193, 194.**

5. **Schools § 13.2 (NCI3d)— teacher dismissal—pre-hearing communications between superintendent and Board members—no error**

Pre-hearing communications between a school superintendent and Board of Education members did not bias the Board against plaintiff teacher at his dismissal hearing where the superintendent merely advised the Board, as he was required to do by statute, that he recommended the dismissal of plaintiff. Plaintiff failed to show how the Board may have been biased by the pre-hearing communication between the superintendent and the Board.

**Am Jur 2d, Schools §§ 193, 198.**

6. **Schools § 13.2 (NCI3d)— teacher dismissal—admission of evidence—chain of custody**

An SBI serologist was properly allowed to testify as to the results of tests he had performed on towels in a proceeding to dismiss a teacher where a proper chain of custody was established with respect to the towels. The Rules of Evidence are not applicable to teacher dismissal hearings before a board of education; as long as the evidence which is proffered at a teacher dismissal hearing can be said to be of a kind commonly relied upon by reasonably prudent persons in the conduct of serious affairs, such evidence is competent and may properly be admitted into evidence.

**Am Jur 2d, Schools § 194.**

7. **Schools § 13.2 (NCI3d)— teacher dismissal—admission of evidence—remoteness in time**

A bucket and cloths recovered from a closet some 36 days after plaintiff teacher last had access to the closet were admissible at plaintiff's dismissal hearing. Remoteness in time goes to the weight of the evidence and not to its admissibility.

**Am Jur 2d, Schools § 194.**

8. **Schools § 13.2 (NCI3d)— teacher dismissal—sufficiency of evidence**

There was substantial evidence from which the Pender County Board of Education could properly conclude that the grounds for the superintendent's recommendation to dismiss plaintiff were true and substantiated by a preponderance of the evidence. The evidence shows that Helen Sidbury alleges engaging in sexual relations with plaintiff, her teacher, between 2:30 and 3:00 p.m. on 3 April 1989; while plaintiff staunchly denies this allegation and states that he was elsewhere during the critical time period, two witnesses testified that they saw plaintiff's vehicle in the school parking lot during the time which plaintiff claims he was away from campus in that vehicle; only one of those who testified that they saw plaintiff returning to campus could say that he possibly saw plaintiff leaving the campus prior to 3:00 p.m.; the bulk of the evidence came from 38 witnesses, and their credibility unquestionably played a major role in the Board's decision;

and the documentary and physical evidence tipped the scale in favor of substantiating the charges.

**Am Jur 2d, Schools §§ 164, 176, 184, 201.**

**Sexual conduct as ground for dismissal of teacher or denial or revocation of teaching certificate. 78 ALR3d 19.**

Judge WELLS concurring.

Judge GREENE dissenting.

APPEAL by plaintiff from Order entered 4 May 1990 in PENDER County Superior Court by *Judge James R. Strickland.* Heard in the Court of Appeals 13 March 1991.

*Reid, Lewis, Deese & Nance, by James R. Nance, Jr.,* for *plaintiff-appellant.*

*Hogue, Hill, Jones, Nash & Lynch, by William L. Hill, II,* for *defendant-appellee.*

WYNN, Judge.

In the spring of 1989, plaintiff, Jefferson L. Evers ("Evers"), was employed by the defendant Pender County Board of Education as a teacher at Pender High School. His duties at the school included teaching, and coaching the school's baseball and football teams. His classroom was located in the school's gymnasium.

In 1986, Evers became acquainted with Helen Sidbury who, at the time, was a ninth grade student at Pender High School. Over the next three years, Evers' relationship with Helen Sidbury developed to the point where Helen began to depend on Evers as a close friend and confidante. Helen wrote poems for Evers, and after class, Evers would often walk with Helen from the gymnasium to the main campus.

On 25 April 1989, Evers was asked to meet with Dr. Haywood Davis, the Pender County Superintendent of Schools. At that time, he was advised that there had been allegations of improper conduct occurring between him and Helen Sidbury. Specifically, it was alleged that on 3 March 1989 and again on 3 April 1989, Evers had engaged in sexual relations with Helen during school hours and on school grounds. Following the meeting, the superintendent gave Evers a letter notifying him that effective 25 April 1989,

he was on suspension with pay from his teaching position at Pender High School pending an investigation into the allegations.

Following his investigation, the superintendent notified Evers on 10 August 1989 that it was his intention to recommend to the Pender County Board of Education that Evers be dismissed. At Evers' request, a hearing concerning the allegations against him began on 12 September 1989.

During Evers' dismissal hearing, Helen Sidbury was the main witness against him. She testified that on 3 April 1989, she was allowed to leave her sixth period class, which began at 2:05 p.m., in order to go see Ms. Shane Covil, a teacher at Pender High School and the school's softball coach. Helen testified that since the softball team was having a game on that day, she decided to ask Ms. Covil if she needed any help in preparing for the day's game. During sixth period, Ms. Covil taught girl's physical education, so her classroom, like Evers', was located in the school gymnasium. Helen left her sixth period class at about 2:20 p.m. or 2:25 p.m. and went straight to the gymnasium. Upon arriving there, she could not find Ms. Covil, so she decided to go talk to Mr. Evers in his classroom. When Helen arrived at Evers' classroom, she knocked on the door and Evers answered. She went inside and they sat down and talked for for about five minutes. After this five minute conversation, Evers went to the back of the classroom where a closet containing sports equipment was located and requested Helen to come back to the room. The two went inside the closet, embraced, and began kissing. Helen testified that after the two had been kissing for a "minute or two," Evers asked her if she wanted to make love and she replied, "Okay." When asked on cross-examination at the hearing whether she had in fact wanted to make love to Evers, Helen testified that she "wanted to do whatever he wanted me to do."

Helen went on to testify that Evers told her to lie down and that, when she did, he began to "finger" her, which she explained to mean that he inserted his finger into her body. According to Helen, Evers then performed cunnilingus on her. During this act, she testified, someone knocked at Evers' classroom door and Evers quickly stood up and told her not to move. Once the knocking had stopped, Evers pulled Helen up by the hands and the two began to kiss again. Helen testified that Evers then lifted her shirt, unhooked her bra, and fondled and placed his mouth on her

breast. Following this act, Evers asked Helen to perform fellatio on him, which she did. After performing fellatio, Helen testified that she lay down again and Evers again "fingered" her and performed cunnilingus on her. Thereafter, the two engaged in intercourse. Helen testified that after about three or four minutes, Evers withdrew his penis and ejaculated on her stomach. Evers then grabbed a towel which had been in a bucket or trash can and used it to wipe the semen off her stomach and to wipe off himself.

Following the intercourse, Helen testified that she and Evers stood up, embraced and kissed. They then got dressed, but Evers left the closet first to make sure that no one could see them leaving the closet. Once back inside the classroom, Helen testified, she and Evers conversed for about three minutes while sharing a soft drink, and then the final school bell rang, at which time Helen left to go home.

A few days later, Helen, fearing that she was pregnant, told Ms. Covil about the incident with Evers. Ms. Covil informed school's Athletic Director and that ultimately led to the charges which were the subject of Evers' dismissal hearing.

Testimony given by various other witnesses tended to corroborate certain aspects of Helen's allegations.

Teacher Shane Covil testified that as the softball coach, she was responsible for preparing the playing field for a softball game scheduled for 3 April 1989. On that date, she first "dragged" the infield, which she explained to be a process by which the surface of the infield is smoothed over by dragging a "grate" behind a tractor, however, after dragging the softball field, she did not have time to "lime" the field, which is the process by which the foul lines and batters' boxes are marked.

Covil testified that between fifth and sixth period, she went to Evers' classroom and asked him where the field "limer" was located. Apparently, she misunderstood him to say that the "limer" was located in the press box. (Later, the "limer" was found in the ticket booth.) After getting her sixth period physical education class started at 2:05 p.m., Covil went to the softball field at 2:20 p.m. where Amy Carr and Joy Ramsey, students at Pender High School, were waiting to help her lime the field. On the way to the field, she noticed that Evers' truck was parked in the parking lot. At the softball field, unable to find the "limer," Covil sent

EVERS v. PENDER COUNTY BD. OF EDUCATION

[104 N.C. App. 1 (1991)]

Amy Carr and Joy Ramsey to look for Evers and again ask where the items were. Meanwhile, Covil and Tommy White, a man who helped out with the junior varsity baseball team, continued to look around the press box for the items. The two students came back to the softball field at about 2:40 p.m. and reported that even though Evers' truck was in the parking lot, they were unable to find him.

Covil then left the softball field at about 2:40 p.m. or 2:45 p.m. to go to the gymnasium herself to look for Evers. When she arrived at Evers' classroom, she knocked on the door but there was no answer. She noticed Evers' truck was still in the parking lot and she decided to wait in the gymnasium and periodically looked out of the windows at his truck so that she would not miss him when he left the school grounds for the day. When the final school bell rang at 3:00 p.m., Covil's team manager, Adam Williamson, entered the gymnasium and informed her that the field limer had been found in the ticket booth and Covil returned to the softball field.

Covil further testified that Evers drove up to the softball field at about 3:20 p.m. or 3:25 p.m. After determining that Covil had found the "limer," he remained on the field for about five minutes and then drove away. She further testified that she did not see Evers with any of his baseball players when he was at the softball field.

Amy Carr testified at the hearing that when she and Joy Ramsey looked for Evers to ask him where the "limer" was located, they noticed that his truck was parked in the parking lot, but they were unable to find him. They knocked on Evers' classroom door, but there was no answer. Thereafter, she and Joy peeked through a window and saw that Evers' classroom was dark. She also testified that the door to the classroom was locked.

Of the several witnesses who testified that they had seen Evers on the afternoon of 3 April 1989, none could testify that he/she knew his whereabouts between 2:15 p.m. and 3:00 p.m., except Tommy White. He testified that he saw Evers "pulling out" of the campus parking lot somewhere between 2:30 p.m. and 3:00 p.m. on 3 April 1989, however, he could not be any more certain of the time that he saw Evers. Of the other witnesses who testified as to having seen Evers that afternoon, Jeff Johnson, who was the baseball team manager, testified that he saw Evers

drive up to the softball field area at about 3:10 p.m. or 3:15 p.m.; Matthew Barnhill, who was a baseball player at Pender High School on 3 April 1989, testified that Evers arrived at the softball field at about 3:05 p.m.; Wendy Brown, who was a softball player for the high school at the time, testified that she did not see Evers at the field until 3:20 p.m., although she admitted that she did not see him drive up; and Keith Daniels, another former baseball player at Pender High School, testified that Evers pulled into the softball field somewhere between 3:05 p.m. and 3:20 p.m.

Throughout Evers' dismissal hearing, various pieces of documentary and physical evidence which tended to corroborate certain aspects of the alleged incident were admitted into evidence. Among them were four poems which Helen testified that she wrote for Evers. One of the poems was dated 6 March 1989, three days after the alleged incident of 3 March 1989. It reads as follows:

I Can't Help But Doubt

You always said be careful
There's only one thing some guys want
They convince you you want to do
Something, when deep inside you don't.

They say that you can trust them,
That they will be your friend.
But once you give them what they want,
They're never seen again.

And though I've grown to trust you,
I can't help but doubt.
That you may be one of those,
You used to warn about.

/s/ Helen Sidbury
March 6, 1989

In addition to the four poems, Helen's personal calendar was admitted into evidence. In essence, Helen testified that her personal calendar served as a combination diary/appointment book, on which entries were made "usually that day or sometime right after or if it is something that is coming up, then . . . before [the day] gets there." In addition to several benign entries, the calendar contained the following notations: (1) February 23—"*K w/JE"— Helen testified that the "K" stood for a kiss and "JE" meant that

EVERS v. PENDER COUNTY BD. OF EDUCATION

[104 N.C. App. 1 (1991)]

it was with Jefferson Evers. The asterisk always indicated that an entry dealt with Jefferson Evers; (2) March 3, 1989—"1st BJ + F *JE"—Helen testified that this notation meant that it was the first time anything "really" happened. She said that "BJ" meant that she gave a "blow job," "F" meant that she was "fingered," and "*JE" meant that it was with Jefferson Evers; (3) April 3, 1989—"1st time *JE"—"1st time" meant that it was the first time she had ever had sex and "*JE" meant that it was with Jefferson Evers.

David J. Spittle, a forensic serologist with the SBI, examined two cloths which were found in a bucket located in the closet in Evers' classroom. He testified that the larger of the two towels tested positive for the presence of spermatozoa, which is the male reproductive cell found in semen.

Based upon this and other evidence, the Pender County Board of Education adopted a Resolution which found that with respect to the incident alleged to have occurred 3 April 1989, the charges against Evers were "true and substantiated by a preponderance of the evidence." The Board failed to find, however, that the alleged incident of 3 March 1989 was true and substantiated by a preponderance of the evidence. Based on its findings regarding the 3 April 1989 incident, the Board concluded that Evers should be dismissed. Evers subsequently filed a petition for judicial review of the Board's Resolution in Pender County Superior Court. From the Order of the superior court affirming the Board's resolution, Evers now appeals. Additional facts appear in the body of the opinion as necessary.

I

[1] In his first assignment of error, plaintiff contends that the Pender County Board of Education's Resolution was made (1) in excess of statutory authority or jurisdiction; and (2) upon unlawful procedure. As such, he argues that under the provisions of N.C. Gen. Stat. § 150B-51, the trial court erred in affirming the Board's Resolution.

We note initially that while N.C. Gen. Stat. § 150B-2(1) expressly excepts local boards of education from the coverage of the Administrative Procedure Act (Chapter 150B of the General Statutes), our Supreme Court has nonetheless held that the standards for judicial review set forth in N.C. Gen. Stat. § 150A-51 (now section

150B-51) apply to appeals from school boards. *See Overton v. Goldsboro City Bd. of Educ.*, 304 N.C. 312, 283 S.E.2d 495 (1981). Although the *Overton* Court specifically focused on subsection (5) of section 150A-51 (now subsection (b)(5) of section 150B-51), given the Court's rationale for doing so, we conclude that the intention was to make each of the subsections of section 150A-51 applicable to an appeal from a decision of a board of education. *See Overton*, 304 N.C. at 316-17, 283 S.E.2d at 498 (Since no other statute provided guidance for judicial review of school board decisions, and in the interest of maintaining uniformity in the review of administrative board decisions, the Court concluded that N.C. Gen. Stat. § 150A-51 should be applied to appeals from school board decisions).

North Carolina General Statutes section 150B-51(b) provides, in part, that a court reviewing the decision of a board of education may reverse such decision if it finds that "the substantial rights of the [petitioner] may have been prejudiced because the [board's] findings, inferences, conclusions, or decisions [were]: . . . (2) In excess of statutory authority or jurisdiction . . . ; or (3) Made upon unlawful procedure . . . ." N.C. Gen. Stat. § 150B-51(b)(2) and (b)(3) (1987). Plaintiff contends that the requirements for reversal contained in these subsections were met because the Pender County Superintendent of Schools failed to timely initiate dismissal proceedings against him as required by N.C. Gen. Stat. § 115C-325(f1), which provides as follows:

(f1) Suspension with Pay.—If a superintendent believes that causes may exist for dismissing or demoting a probationary or career teacher for any reasons specified in G.S. 115C-325(e)(1)b through 115C-325(e)(1)j, but that additional investigation of the facts is necessary and circumstances are such that the teacher should be removed immediately from his duties, the superintendent may suspend the teacher with pay for a reasonable period of time, not to exceed 90 days. The superintendent shall immediately notify the board of education of his action. *If the superintendent has not initiated dismissal or demotion proceedings against the teacher within the 90-day period, the teacher shall be reinstated to his duties immediately and all records of the suspension with pay shall be removed from the teacher's personnel file at his request.*

N.C. Gen. Stat. § 115C-325(f1) (1990) (emphasis added).

EVERS v. PENDER COUNTY BD. OF EDUCATION

[104 N.C. App. 1 (1991)]

The record reveals that plaintiff was suspended with pay on 25 April 1989, and that the .superintendent made his recommendation of dismissal to the Board of Education on 10 August 1989. It is therefore given that the superintendent did not "initiate" dismissal proceedings against plaintiff until 107 days after plaintiff was suspended with pay.

Plaintiff asserts that because the superintendent failed to initiate dismissal proceedings within ninety days of plaintiff's suspension with pay, the only course of action which section 115C-325(f1) authorized the superintendent to take was to reinstate plaintiff to his duties. He further argues that the clear legislative intent of section 115C-325(f1) is to foreclose the superintendent's ability to initiate dismissal proceedings against a teacher who has been suspended with pay once ninety days without the initiation of dismissal proceedings have passed. For the reasons which follow, we are of the opinion that the General Assembly, in enacting N.C. Gen. Stat. § 115C-325(f1), did not intend to prohibit the initiation of dismissal proceedings against a teacher who has been suspended with pay once ninety days beyond the date of such suspension have lapsed.

The legislative intent of a statute should be ascertained from the language of the statute, the nature and purpose of the statute, and the consequences which would follow from a construction one way or the other. *Campbell v. First Baptist Church of City of Durham*, 298 N.C. 476, 259 S.E.2d 558 (1979). Where a statute's language is clear and unambiguous, the language must be given effect, and its clear meaning may not be evaded by the courts under the guise of construction. *State v. Felts*, 79 N.C. App. 205, 339 S.E.2d 99, *disc. review denied*, 316 N.C. 555, 344 S.E.2d 11 (1986).

In the instant case, the language of N.C. Gen. Stat. § 115C-325(f1) is clear and unambiguous: If the superintendent fails to initiate dismissal proceedings against a teacher who has been suspended with pay within ninety days of such suspension, the teacher must be reinstated. However, we believe that the language of N.C. Gen. Stat. § 115C-325(f1) is equally clear that reinstatement from suspension and upon request removal of the suspension action from the teacher's record are the *only* consequences which follow from a superintendent's failure to timely initiate dismissal proceedings. Section 115C-325(f1) does not provide that the failure to initiate dismissal proceedings within the statutorily prescribed time limit

will forever bar the initiation of dismissal proceedings; the statute merely requires that the teacher be removed from suspension. Were we to construe section 115C-325(f1) as plaintiff would have us construe it, we would be inserting language into the statute which is not there.

Moreover, we believe that utilizing plaintiff's interpretation of section 115C-325(f1) would lead to absurd results. Under plaintiff's interpretation of the statute, *any* teacher who has been suspended with pay, regardless of his misconduct, would be entitled to defend dismissal proceedings by pleading the "lapse of ninety days." This would mean that a teacher suspected of dealing drugs to students, or of the rape or murder of a student, would be entitled to permanent reinstatement to his teaching position once ninety days without the initiation of dismissal proceedings against him had lapsed. It is to be presumed that the legislature acted in accordance with reason and common sense, and did not intend "untoward results." *State ex rel. Comr. of Ins. v. North Carolina Rate Bureau,* 43 N.C. App. 715, 720, 259 S.E.2d 922, 925, *disc. review denied,* 299 N.C. 735, 267 S.E.2d 670 (1980). Clearly, the examples mentioned above would lead to absurd results; however, these results would be required were plaintiff's interpretation of section 115C-325(f1) given effect.

We hold that while N.C. Gen. Stat. § 115C-325(f1) clearly requires the reinstatement of a teacher who has been suspended with pay once ninety days without the initiation of dismissal proceedings have lapsed, it does not prohibit the subsequent initiation of dismissal proceedings against such teacher. Since the plaintiff challenges only the initiation of dismissal proceedings against him on 10 August 1989, and not the superintendent's failure to reinstate him to his position after ninety days, we need not address the latter point. Plaintiff's assignment of error is overruled.

II

[2] In his second assignment of error plaintiff contends the Board of Education exceeded its statutory authority by calling two of its own witnesses to testify at the dismissal hearings. Plaintiff contends that since the witnesses' names were not on a list of witnesses which the superintendent was required to give to plaintiff prior to the hearing, a majority vote of the Board of Education was required before the witnesses could be called.

N.C. Gen. Stat. § 115C-325(j) provides, in pertinent part, as follows:

> (5) At least five days before the hearing, the superintendent shall provide to the teacher a list of witnesses the superintendent intends to present, a brief statement of the nature of the testimony of each witness and a copy of any documentary evidence he intends to present. At least three days before the hearing, the teacher shall provide to the superintendent a list of witnesses the teacher intends to present, a brief statement of the nature of the testimony of each witness and a copy of any documentary evidence he intends to present. *Additional witnesses or documentary evidence may not be presented except upon consent of both parties or upon a majority vote of the board or panel.*

N.C. Gen. Stat. § 115C-325(j)(5) (1990) (emphasis added).

After carefully reviewing the record and transcript, it is unclear whether or not the Board actually voted to allow the witnesses to testify. Nonetheless, in response to a specific call by the Board Chairman for objections to the testimony of these two witnesses, plaintiff remained silent and failed to object. Since an objection to testimony not taken in apt time is deemed to be waived, *State v. Hensley*, 29 N.C. App. 8, 222 S.E.2d 716, *cert. denied*, 290 N.C. 95, 225 S.E.2d 325 (1976), plaintiff's assignment of error is overruled.

III

[3] Plaintiff next contends that he was denied due process of law because, throughout the dismissal hearing, the Pender County Board of Education's attorney was allowed to act as an "impartial law judge" and to make certain procedural and evidentiary rulings. We disagree.

In *Thompson v. Wake County Board of Education*, this court held that absent a showing that the participation of a Board of Education's attorney in dismissal hearings resulted in biasing the Board or prejudicing the petitioner, such participation is not a violation of due process. 31 N.C. App. 401, 414, 230 S.E.2d 164, 172 (1976), *rev'd on other grounds*, 292 N.C. 406, 233 S.E.2d 538 (1977). Plaintiff contends that he was prejudiced because Richard Von Biberstein, Jr., the Board's attorney, was involved in the superintendent's pre-hearing investigation of the allegations against plaintiff, and because the Board used Von Biberstein's notes during

EVERS v. PENDER COUNTY BD. OF EDUCATION

[104 N.C. App. 1 (1991)]

its deliberations. Prior to the Board's deliberations, the following exchange took place:

> BY [PLAINTIFF'S COUNSEL]: When the Board deliberates, will Mr. Von Biberstein's notes be a part of that deliberation?

> BY CHAIRMAN TAYLOR: Yes. The notes that he has taken in this proceeding.

> BY [PLAINTIFF'S COUNSEL]: What about the notes he took when he was representing [the superintendent] in the investigation . . . ?

> BY CHAIRMAN TAYLOR: No, sir; only the notes of this proceeding, and the documents that have been introduced into evidence.

> BY [PLAINTIFF'S COUNSEL]: Okay.

> BY [BOARD MEMBER]: The notes he has are the notes that we have.

> BY [PLAINTIFF'S COUNSEL]: I think you can understand why I asked that question.

> BY CHAIRMAN TAYLOR: I certainly do.

> BY MR. BIBERSTEIN: The only thing to be considered by this Board is the evidence presented at this hearing.

It is clear from the above discussion that the Board did not consider any of the notes prepared by its attorney during the investigation. Thus, there was no danger that the Board was in any way biased by Von Biberstein's prior investigatory notes. Similarly, there has been no showing that the plaintiff was in any way prejudiced by the Board's use of Von Biberstein's hearing notes during deliberations. Indeed, plaintiff manifested his acquiescence in the Board's use of Von Biberstein's notes by saying, "Okay" when told that only the notes which Von Biberstein took during the hearing would be used. Plaintiff cannot now be heard to complain that he suffered any prejudice by Von Biberstein's participation in the hearings. Plaintiff's assignment of error is without merit and is, therefore, overruled.

IV

[4] Plaintiff's next assignment of error makes an inarticulate reference to "rumors" concerning the plaintiff which the plaintiff

now contends biased the Board of Education against him and influenced its decision to dismiss him. He also contends that the superintendent admitted to having communicated with the Board about the "Evers matter" prior to the hearing and to having communicated his belief of plaintiff's guilt to the Board. As such, plaintiff asserts that he was denied his due process right to "a fair trial in a fair tribunal." *See Crump v. Board of Educ. of the Hickory Admin. School Unit*, 93 N.C. App. 168, 178, 378 S.E.2d 32, 38 (1989), *modified and aff'd*, 326 N.C. 603, 392 S.E.2d 579 (1990).

Our Supreme Court has noted that "[a]n unbiased, impartial decision-maker is essential to due process." *Crump v. Board of Educ. of the Hickory Admin. School Unit*, 326 N.C. 603, 615, 392 S.E.2d 579, 585 (1990). Bias has been defined as "a predisposition to decide a cause or an issue in a certain way, which does not leave the mind perfectly open to conviction." *See° id.* "Bias can refer to preconceptions about facts, policy or law; a person, group or object; or a personal interest in the outcome of some determination." *Id.* However, in order to prove bias, it must be shown that the decision-maker has made some sort of commitment, due to bias, to decide the case in a particular way. *Id.*

As mentioned, plaintiff contends that both rumors and prehearing communications between the superintendent and the Board infected the Board and caused it to develop a preconceived notion of plaintiff's guilt of the actions alleged. With respect to the alleged "rumors," plaintiff's counsel brought the subject up during the dismissal hearing while cross-examining Joe Clay Jones, a teacher and coach at Pender High School. The transcript reveals that the subject was addressed as follows:

Q: Mr. Jones, has anyone ever spread any false rumors or accusations or lies about you that you are aware of or have been made aware of?

A: Not that I have been made aware of. Now, they could have done it and I was not aware of it.

Q: Is it a possibility?

A: Yes.

BY MR. BIBERSTEIN: In that context, Mr. Chairman, I think the Board probably needs to be told, at this point, that the presence of rumors is not proof of anything and this Board

should not consider the fact that there were rumors involved in this particular incident as proof of anything. This Board has to find facts, not rumors, before they can substantiate and find true the charges of the superintendent.

The Board needs to understand the fact that somebody is spreading a rumor or talking about a rumor does not constitute evidence of anything against Mr. Evers.

BY CHAIRMAN TAYLOR: We understand that and let the record reflect that this Board has heard nothing but rumors and has worked diligently to disregard the rumors. All we are after is the facts.

BY [PLAINTIFF'S COUNSEL]: Thank you. I thank you. That is all I was getting at. If it please the Board, thank you. I just wanted to make it known that students and people in general do spread rumors and do gossip, but that does not make it true, and I know that we are all human and you all are doing a fine job, and I want this to be on the record, you know, sorting this out, but I think we need to say it, and that is all I wanted to bring out.

Our Supreme Court has recognized that prior knowledge and discussion of the facts relating to a given adjudicatory hearing are inevitable aspects of the multi-faceted roles which Board members play. *See Crump*, 326 N.C. at 616, 392 S.E.2d at 579. As long as Board members are able to set aside their prior knowledge and preconceptions concerning the matters at issue, and to base their considerations solely upon the evidence presented during the hearing, constitutionally impermissible bias does not exist. *Id.* at 617, 392 S.E.2d at 579. We similarly conclude that exposure to rumors is not, in and of itself, cause to believe that Board members have been biased.

In the instant case, plaintiff not only fails to indicate the exact nature of the rumors which the Board is alleged to have considered, but he also fails to point out how the Board may have been biased by the rumors. In short, there is no indication that the Board based its conclusions on anything other than the evidence which was adduced at the hearing. Under such circumstances, we conclude that the instruction which attorney Von Biberstein gave to the Board regarding rumors and the Board Chairman's assurance that the Board would consider nothing more than the evidence presented

during the hearing are sufficient indicia of the fact that the Board was not influenced by rumors and that it acted impartially.

**[5]** We likewise conclude that the pre-hearing communications between the superintendent and the Board members did not bias the Board against plaintiff. During plaintiff's counsel's cross-examination of the superintendent, the following testimony was elicited:

> Q: Doctor Davis, because of the seriousness of the charges, I need to ask you the next question. Do you recall whether or not you have discussed the allegations in this case with the Board members?
>
> A: As soon as I suspended Mr. Evers, I got on the phone and notified the members of the Board of Education.
>
> Q: Individually?
>
> A: Yes.
>
> Q: Via telephone?
>
> A: Correct.
>
> Q: And do you remember what you told them?
>
> A: I told them the nature of the charges and simply that there had been charges made concerning Mr. Evers having sex with a student and that, based on the seriousness of the charges, I had suspended him with pay pending an investigation.
>
> Q: I do not want to infer the wrong thing. So your actual decision to suspend him was really based upon the "seriousness of the charges" itself; sex with a student?
>
> A: Yes.
>
> Q: And that alone?
>
> A: Correct.
>
> Q: Have you discussed this case with them on any other occasion other than that first notice?
>
> A: Yes.
>
> Q: Have you communicated to them any feelings that you may have about Mr. Evers' guilt or innocence?

A: Directly, no; indirectly, possibly so, in terms of the action that has been taken.

Q: That is fine. . . .

In *Crump*, the Supreme Court made it clear that mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of Board members at a later adversary hearing. 326 N.C. at 617, 392 S.E.2d at 579. As with his contention regarding "rumors," plaintiff has failed to show how the Board may have been biased by the pre-hearing communication between the superintendent and the Board. The superintendent merely advised the Board, as he was required to do by statute, that he recommended the dismissal of plaintiff. *See* N.C. Gen. Stat. § 115C-325(f1). It is also important to note that the superintendent did not admit to having directly told the Board that he thought plaintiff was guilty; rather, the superintendent indicated that his belief in plaintiff's guilt was implicit from the action he took in recommending plaintiff's dismissal. In sum, we conclude that plaintiff has failed to rebut the presumption that the actions of the Pender County Board of Education were correct and free from bias against plaintiff. This assignment of error is overruled.

V

[6] Plaintiff next assigns error to the Board's admission of the forensic serologist's testimony regarding the results of the laboratory tests which he performed on the two cloths found in the closet in Evers' classroom. Plaintiff contends that the testimony was incompetent because the chain of custody of the cloths was not properly established and because the evidence was too remote to link the plaintiff to it.

We note initially that the Rules of Evidence are not applicable to teacher dismissal hearings before a board of education. N.C. Gen. Stat. § 115C-325(j)(4) (1990). Rather, boards of education "may give probative effect to evidence that is of a kind commonly relied on by reasonably prudent persons in the conduct of serious affairs." *Id.* In *Faulkner v. New Bern-Craven Board of Education*, 311 N.C. 42, 316 S.E.2d 281 (1984), our Supreme Court recognized an apparent tension between N.C. Gen. Stat. § 115C-325(j)(4) and -325(l)(1) and (2). 311 N.C. at 57, 316 S.E.2d at 290. The latter two subsections refer to the necessity of evidence upon which a board makes its

EVERS v. PENDER COUNTY BD. OF EDUCATION

[104 N.C. App. 1 (1991)]

decision being "competent." While the phrase "competent evidence" is not defined in N.C. Gen. Stat. § 115C-325, we agree with the *Faulkner* Court's belief that a strong argument could be made that "competent evidence," for the purposes of teacher dismissal hearings, refers to "evidence that is of a kind commonly relied on by reasonably prudent persons in the conduct of serious affairs." *See id.* We therefore conclude that as long as evidence which is proffered at a teacher dismissal hearing can be said to be of a kind commonly relied upon by reasonably prudent persons in the conduct of serious affairs, such evidence is competent and may properly be admitted into evidence.

In the instant case, we believe that the cloth towels were properly authenticated and that there was a sufficient showing that they may have been connected to the plaintiff.

With respect to the chain of custody, Dr. Haywood Davis testified that on 31 May 1989, after Evers had been suspended, he first learned in an interview with Mr. Charles Sidbury, Helen's father, that a towel had allegedly been used to wipe off Helen's stomach after intercourse with Evers. The superintendent testified that immediately upon hearing this information, he went to Pender High School and asked the Pender High School principal to let him into Evers' former classroom so that he could inspect the closet where the alleged sexual relations took place. The principal unlocked the door to the closet and once inside, the superintendent noticed a bucket in the corner of the closet. Upon further inspection of the bucket, the superintendent testified, he found a cloth which "appeared to have something on it." The superintendent testified that he confiscated the bucket and its contents and kept them in his office until 15 June 1989, at which time he turned them over to the Pender County Sheriff's Department. Pender County Sheriff's Detective Warren Days testified that the bucket and its contents were locked in his locker for safekeeping for a few days until it was forwarded by certified mail to the State Bureau of Investigation ("SBI") for analysis. Sometime later, the SBI returned the items to the Sheriff's Department via first class mail along with its analysis. Detective Warren subsequently returned these items to the superintendent who had been asked to turn the items over to Evers so that Evers could have the items analyzed by his own expert.

Based upon this evidence, we are of the opinion that a proper chain of custody was established with respect to the towels and that, therefore, the SBI forensic serologist was properly allowed to testify as to the results of the tests he performed on the towels.

[7] Plaintiff also contends that since the bucket and the cloths were not recovered from the closet until some thirty-six days after Evers last had access to the closet, both the towels and any evidence relating to them were inadmissible. We disagree.

"Generally, remoteness in time goes to the weight of the evidence and not to its admissibility." *State v. Schultz*, 88 N.C. App. 197, 203, 362 S.E.2d 853, 857 (1987) (citing *State v. Brown*, 280 N.C. 588, 187 S.E.2d 85, *cert. denied*, 409 U.S. 870, 34 L.Ed.2d 121 (1972)). We therefore conclude that the towels which were found in the closet in Evers' classroom, and the results of the tests performed upon them were properly admitted.

## VI

[8] In his final assignment of error, plaintiff contends that the Board's decision to dismiss him was unsupported by substantial evidence in view of the entire record. As such, he argues that the trial court erred in failing to reverse the Board's decision. For the reasons which follow, we are of the opinion that the trial court properly affirmed the decision of the Pender County Board of Education.

In its resolution, the Pender County Board of Education set forth the following statutory grounds for plaintiff's dismissal: (1) Inadequate performance of teaching duties; (2) Immorality; (3) Neglect of duty; (4) Failure to fulfill the duties and responsibilities imposed upon teachers by the General Statutes of this State; and (5) Conduct which constitutes grounds for the revocation of a career teacher's teaching certificate. *See* N.C. Gen. Stat. § 115C-325(e)(1)a, b, d, i, and k.

As previously mentioned, N.C. Gen. Stat. § 150B-51 sets forth the appropriate standard of review for appeals from school boards. It provides that the trial court may reverse the decision of the school board if it finds that the decision is unsupported by substantial evidence in view of the entire record. *See* N.C. Gen. Stat. § 150B-51(b)(5) (1987). The standard of review set forth in section 150B-51(b)(5) has come to be known as the "whole record" test. *Henderson v. North Carolina Dept. of Human Resources*, 91 N.C.

EVERS v. PENDER COUNTY BD. OF EDUCATION

[104 N.C. App. 1 (1991)]

App. 527, 530, 372 S.E.2d 887, 889 (1988). As stated by our Supreme Court:

> The "whole record" test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it . . . . On the other hand, the "whole record" rule requires the court, in determining the substantiality of the evidence supporting the Board's decision, to take into account whatever in the record fairly detracts from the weight of the Board's evidence.

*Thompson v. Wake County Bd. of Educ.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977) (citations omitted).

In determining this issue, then, we must consider "all of the evidence, both that which supports the decision of the Board and that which detracts from it" in order to determine whether the decision is supported by substantial evidence. *Overton v. Goldsboro City Bd. of Educ.*, 304 N.C. 312, 318, 283 S.E.2d 495, 499 (1981). Since the Board failed to find that the charges relating to 3 March 1989 were true and substantiated, we need only focus on the events of 3 April 1989.

For the sake of brevity, the evidence adduced at the hearing which tends to support the Board's decision is summarized as follows:

1. Helen Sidbury's testimony that on 3 April 1989, she left her sixth period class at about 2:20 p.m. or 2:25 p.m. in order to go see teacher Shane Covil; that when she could not find Covil, she decided to go see Evers; that when she arrived at Evers' classroom, she and Evers talked for about five minutes, and then Evers went to a closet in the backroom; that Evers called her back to the closet and once inside, the two engaged in various sexual acts; that after Evers ejaculated onto her stomach, he used a cloth or towel to wipe off both Helen and himself; that after she and Evers left the closet, the final school bell rang and she left.

2. Shane Covil's corroborative testimony that she could not find Evers between 2:20 p.m. and 3:00 p.m., despite searching diligently and despite the fact that she saw his vehicle parked on campus.

3. Amy Carr's corroborative testimony that she also could not find Evers between about 2:25 p.m. or 2:30 p.m. and 2:40 p.m., despite searching diligently and despite having seen his vehicle in the parking lot.

4. Out of five witnesses who testified on behalf of Evers, only one claimed to have seen him before 3:05 p.m.

5. The four poems which Helen Sidbury wrote conveying romantic feelings toward Evers.

6. Helen's personal calendar which contained secret codes detailing acts which allegedly occurred between Helen and Evers. Helen testified that these entries were made "usually that day or sometime right after or if it is something that is coming up, then . . . before [the day] gets there."

7. Superintendent Davis' testimony that he found a bucket containing two cloths in Evers' classroom closet. His testimony that one of the cloths "appeared to have something on it."

8. The forensic serologist's testimony that the stains on the larger hand towel tested positive for spermatozoa, indicating that semen was present on the towel.

As previously indicated, in determining the substantiality of the evidence supporting the Board's decision, we must take into account not only that evidence which supports the Board's decision, but also that which detracts from it.

Evers' defense was primarily based on his claim that he was not on school grounds at the time of the alleged incident. In addition, he attempted to picture Helen as an emotionally disturbed girl who was prone to fantasize and start rumors about having relationships with other men.

Evers testified that for him, sixth period at Pender High School was a planning period, which meant that did not have a class to teach. He testified that right before sixth period began on 3 April 1989, around 2:00 p.m., he went across campus to the main building so that he could turn in the day's attendance and so that he could talk to Dr. John Davis, the school principal. When he arrived there, Evers testified, Dr. Davis' secretary informed him that the principal was engaged in other business at that time. After waiting for awhile, Evers testified that he left the office area with the intent of going home to get some baseball practice

gear. He testified that because his wife also taught at Pender High School, his usual routine when going home during the day would be to stop by his wife's classroom, tell her that he was leaving campus, and ask her if she needed him to bring her anything. Evers could not say for certain whether he followed this custom on 3 April 1989.

Evers went on to testify that he left the campus in his Ford Bronco around 2:35 p.m. and that, on the way out of the parking lot, he saw Tommy White, a parent volunteer for the school's junior varsity baseball team. Upon arriving at home, which was approximately four miles from the school, Evers testified that his father was about to leave for work. After gathering the practice gear and changing clothes, he got back into his vehicle and drove back toward the school. He further testified that on the way back to the school, he stopped at a store for a soft drink. According to Evers, he arrived back at the school around 3:10 p.m. or 3:15 p.m.. Upon arriving there, he drove directly to the softball field because he knew that there was a softball game that day. Evers testified that he parked his vehicle and began talking with some of his baseball players who had come to watch the softball game. He further testified that at about 3:20 p.m., his wife walked up to his vehicle and asked him whether he wanted her to bring him something to eat. Evers responded that he did and, about thirty minutes later, she returned with the food. Finally, Evers testified that at around 4:45 p.m., he and his baseball players left the softball game for baseball practice, which was to begin at 5:00 p.m. on the baseball field.

We note here that Evers' explanation of his whereabouts between 2:15 p.m. and 3:00 p.m. must be viewed with some skepticism. With the exception of Tommy White, none of the people with whom Evers claims he had contact during this time period testified on his behalf. Especially conspicuous is the absence of testimony by Evers' father, who could have substantiated the fact that Evers came home that afternoon. Nor did he produce the grocery store clerk who sold him the soft drink he allegedly bought on the way back to the campus. Finally, Evers' wife did not testify on his behalf. While Evers could not be sure that he stopped by her classroom prior to leaving the campus on that day, he testified that it was his usual practice to do so. Moreover, Evers' wife could have testified that she did, in fact, see Evers at the softball game.

EVERS v. PENDER COUNTY BD. OF EDUCATION

[104 N.C. App. 1 (1991)]

Evers offered the testimony of William Best, an expert in the field of forensic chemistry. Best testified that he too examined the stains which were found on the towel taken from the closet in Evers' classroom. It was his testimony, that while his examination of the larger of the two towels did in fact reveal the presence of spermatozoa, the examination did not reveal the presence of vaginal epithelial cells. Best explained that these vaginal epithelial cells would always be present following vaginal intercourse. He further testified that the absence of vaginal epithelial cells from the towel tested made it unlikely to him that the towel could have been used to wipe off both the female and the male. Near the conclusion of Best's testimony, Board Chairman Taylor asked the following question:

> BY CHAIRMAN TAYLOR: Explain to me, if you can, Mr. Best — here again, understand that we are neither Forensic Chemists nor a professional jury. We are just struggling along here trying to determine the truth of this matter. How can an ejaculation onto a stomach, wiped off with a towel, show [vaginal] epithelial cells?

> BY THE WITNESS: That alone will not, but if there is any contact with the male — the penis — you are going to pick them up. . . .

Finally, two witnesses who testified on Evers' behalf indicated that Helen Sidbury had lied about having affairs before. Margaret Lisa Lane, whose husband was the manager of a store where Helen worked part time, testified that after Evers had been suspended from his job, Evers' wife, who also worked at Pender High School, called her on the phone and told her that Lane's husband was going to be subpoenaed to testify at the Evers hearing. Lane also testified that Evers' wife told her that Helen had been circulating rumors at the school that Helen was having an affair with Lane's husband. She also testified that upon confronting Helen, Helen admitted to having told friends that Lane's husband was her boyfriend. During Helen's testimony she denied having told anyone that she was involved with Lane's husband.

Cheryl Peverett testified that she had known Helen Sidbury very well prior to moving away three years earlier. It was Peverett's testimony that Helen had confessed to being in love with Peverett's husband and to "wanting him." Peverett further testified that a friend of Helen's had told Peverett that Helen, while spending

the night with the friend, did not get much sleep because she was preoccupied with a picture of Peverett's husband. On cross-examination, however, Peverett admitted that she had not had a "deep" conversation with Helen for almost three years.

Having painstakingly reviewed the entire record, we are of the opinion that there was substantial evidence in the record to support the decision of the Board. " 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' " *Thompson v. Wake County Bd. of Educ.*, 292 N.C. 406, 414, 233 S.E.2d 538, 544 (1977) (quoting *Comr. of Insurance v. Fire Insurance Rating Bureau*, 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977) ). " 'Substantial evidence is more than a scintilla or a permissible inference.' " *Id.* (quoting *Comr. of Insurance v. Automobile Rate Office*, 287 N.C. 192, 205, 214 S.E.2d 98, 106 (1975) ).

When the whole record is viewed, the evidence shows that Helen Sidbury alleges engaging in sexual relations with her teacher, friend and confidante, Jefferson Evers, between 2:30 p.m. and 3:00 p.m. on 3 April 1989. While Evers staunchly denies this allegation and states that he was elsewhere during the critical time period, it cannot be ignored that two witnesses testified that they saw Evers' vehicle in the school parking lot during the time which Evers claims he was away from campus in the vehicle spotted. With respect to those who testified that they saw Evers "returning" to campus that afternoon, only Tommy White could say that he "possibly" saw Evers leaving the campus prior to 3:00 p.m.

It must be kept in mind that bulk of the evidence in this case came from the testimony of thirty-eight witnesses. Thus, the credibility of these witnesses unquestionably played a major role in the Board's decision. A school board's decision to dismiss need only be based on a preponderance of the evidence. *See* N.C. Gen. Stat. § 115C-325(k)(2).

In our opinion, the documentary and physical evidence presented at trial provide the weight which "tips the scale" in favor of substantiating the charges against Jefferson Evers. We find the four poems written by Helen Sidbury, especially that which has been reproduced in this opinion, to be especially telling. We also find Helen's personal calendar quite probative, due particularly to its graphic and spontaneous nature.

Lastly, the testimony regarding the presence of semen on the towel found in the closet in Evers' former classroom had a corroborative, if not sobering impact. The fact that neither expert was able to identify the presence of vaginal epithelial cells on the towel, in our opinion, goes only to the weight of the evidence.

In view of the entire record, we conclude that there was substantial evidence from which the Pender County Board of Education could properly conclude that the grounds for the superintendent's recommendation to dismiss plaintiff were true and substantiated by a preponderance of the evidence. Accordingly, the trial court was correct in affirming the decision of the Board of Education. The order from which the plaintiff appeals is, therefore

Affirmed.

Judge WELLS concurs in separate opinion.

Judge GREENE dissents in separate opinion.

Judge WELLS concurring.

I concur in the majority opinion, but point out one area of due process concern. The record makes it clear that in its deliberations, the Board used the notes taken by its attorney at the hearing. This was improper. As the triers of the facts, the Board should have relied entirely on its own recollections of the proceedings, not on its attorney's notes. As the majority opinion points out, plaintiff acquiesced in this action and therefore should not now be allowed to assert it as a basis for denial of due process.

Judge GREENE dissenting.

I concur with the majority's opinion except for its holding that a violation of N.C.G.S. § 115C-325(f1) does not bar the subsequent initiation of dismissal proceedings against a career teacher. Because N.C.G.S. § 115C-325(f1) was violated, I would reverse the dismissal of Jefferson L. Evers (teacher). I therefore dissent.

The statute provides a summary method by which a superintendent of a school system may suspend a career teacher with pay:

If a superintendent believes that cause may exist for dismissing or demoting a probationary or career teacher for any reasons

specified in G.S. 115C-325(e)(1)b through 115C-325(e)(1)j, but that additional investigation of the facts is necessary and circumstances are such that the teacher should be removed immediately from his duties, the superintendent may suspend the teacher with pay for a reasonable period of time, not to exceed 90 days. The superintendent shall immediately notify the board of education of his action. If the superintendent has not initiated dismissal or demotion proceedings against the teacher within the 90-day period, the teacher shall be reinstated to his duties immediately and all records of the suspension with pay shall be removed from the teacher's personnel file at his request.

N.C.G.S. § 115C-325(f1) (1987). Superintendent Davis invoked this section of the statute and suspended teacher with pay on 25 April 1989. On 24 July 1989, 90 days had elapsed without Superintendent Davis having initiated dismissal proceedings. At that time, teacher requested in writing that he be reinstated and that all records of his suspension be removed from his file. Despite this request, teacher was left on suspension and his file was not expunged. Dismissal proceedings were not initiated against teacher until 10 August 1989, 107 days after the suspension began. The statute explicitly authorizes the suspension to last "a reasonable period of time, not to exceed 90 days." Teacher's suspension lasted well beyond the prescribed period, despite his active attempt to be reinstated. I agree with the majority's conclusion that Superintendent Davis violated N.C.G.S. § 115C-325(f1) by not reinstating teacher at the end of 90 days.

I disagree, however, that this procedural violation does not warrant reversing teacher's dismissal. Our standard of review for the dismissal of a career teacher is governed by N.C.G.S. § 150B-51 of the Administrative Procedure Act. See Overton v. Goldsboro City Bd. of Educ., 304 N.C. 312, 316, 283 S.E.2d 495, 498 (1981) (holding that standard of review of school board decisions is N.C.G.S. § 150A-51, now § 150B-51). In reviewing the final decision of the school board, this Court may "reverse or modify the agency's decision if the substantial rights of the [individual] may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are . . . [m]ade upon unlawful procedure . . . ." N.C.G.S. § 150B-51(b)(3) (1987). Teacher's status as a career teacher is a "substantial right." See N.C.G.S. § 115C-325(d)(1) (1987) (career teacher not subject to annual appointment and has protections of other

parts of statute); *Crump v. Board of Educ.*, 326 N.C. 603, 613-14, 392 S.E.2d 579, 584 (1990) (career teacher has a cognizable property interest in continued employment); *Thompson v. Wake County Bd. of Educ.*, 31 N.C. App. 401, 407, 230 S.E.2d 164, 168 (1976), *rev'd on other grounds*, 292 N.C. 406, 233 S.E.2d 538 (1977) (career teacher status carries with it various rights and privileges). Teacher's substantial rights may not be taken away after the school board has violated statutory procedures in the course of teacher's dismissal proceedings. *See Rose v. Currituck County Bd. of Educ.*, 83 N.C. App. 408, 412, 350 S.E.2d 376, 379 (1986) (board cannot dismiss career teacher without affording teacher statutorily mandated procedures of notice and hearing); *Thompson* at 407, 230 S.E.2d at 168 ("career teacher may not be dismissed or demoted except upon specified grounds and in accordance with the statutory procedures provided"). Here, teacher's rights as a career teacher have been affected as a result of procedure which was unlawful.

A school superintendent is free to investigate any career teacher and initiate dismissal or demotion proceedings for conduct occurring up to three years in the past. N.C.G.S. § 115C-325(e)(4) (1983). However, when a teacher is not only investigated, but put on suspension, the superintendent's actions have immediate consequences upon the teacher's career, daily life, and reputation in the community. When a superintendent places a career teacher in this position, it is incumbent on the superintendent to move quickly toward the initiation of formal proceedings. The need to expedite the process in this situation is reflected in the 90-day limitation on a suspension with pay imposed by the General Assembly. This 90-day limit protects teachers from the deleterious consequences of a long-term suspension. When a superintendent takes this action, he or she must be prepared to initiate proceedings within 90 days or reinstate the teacher as required. Where a teacher is suspended under N.C.G.S. § 115C-325(f1) and the superintendent fails to initiate dismissal or demotion proceedings within 90 days *and* fails to reinstate the teacher by the end of the 90-day period, the superintendent is barred from initiating proceedings in the future.

Superintendent Davis failed to initiate formal proceedings within 90 days and refused to reinstate teacher as N.C.G.S. § 115C-325(f1) requires. While formal proceedings were eventually initiated against teacher, there was nothing, if the position of the majority is accepted, to prevent Superintendent Davis from keeping teacher on suspension for up to three years prior to initiation of proceedings.

N.C.G.S. § 115C-325(e)(4). The statute, N.C.G.S. § 115C-325(f1), does not allow such a suspension.

North Carolina Gen. Stat. § 115C-325 imposes procedural deadlines on both teacher and defendants. Defendants cannot selectively disregard part of the statute, while at the same time invoking other parts of it to effect teacher's dismissal. Superintendent Davis' failure to reinstate teacher after failing to proceed within 90 days bars any further disciplinary action in this matter. The trial court's order affirming the decision of the Pender County Board of Education, dismissing teacher, should therefore be reversed.